UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FEB -6 2012
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| SHEILA ROBERTS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 1:10-cv-1074 |
| ) | |
| FAIRFAX COUNTY ) | |
| PUBLIC SCHOOLS, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Fairfax County Public Schools' ("FCPS") Motion for Summary Judgment (Dkt. No. 58). For the reasons stated in open Court and those that follow, it is hereby

ORDERED that FCPS' Motion for Summary Judgment is GRANTED.

### I. Background

Plaintiff Sheila Roberts is a 56-year-old African-American female. She was employed by FCPS from April 2001 to June 17, 2008. In August 2007, Roberts began working as an Applied Behavioral Analysis ("ABA") Instructional Assistant in the Preschool Autism Program ("PAC") at Buzz Aldrin Elementary School ("Aldrin"). She was assigned to PAC teacher Janna Schwartz's classroom, where she worked with fellow Instructional Assistant Richard Johnson, an African-American male.

Before February 2008, Roberts and Schwartz had two meetings with Aldrin Principal Martin Martinoff, in which Schwartz expressed dissatisfaction with Roberts' work performance. On February 6, 2008, Aldrin Assistant Principal Barbara Gist met with Roberts to discuss a series of unexcused absences. On February 8, 2008, Roberts met with Marinoff and Gist to

1

express her desire to transfer from the PAC classroom. She complained that Schwartz yelled at her, failed to communicate with her, and failed to recognize an injury she allegedly obtained. Marinoff gave her permission to transfer and met with Schwartz and Roberts to discuss the expectations for working together. Another meeting between Marinoff, Roberts, Schwartz, Gist, and Roberts took place on February 14, 2008. Marinoff reminded Roberts that failure to improve her relations/communication skills and professionalism could result in a "needs to improve" rating in those areas in her performance review. Roberts, Marinoff, and Gist met yet again on February 25, 2008. The group discussed Roberts' continued failure to follow FCPS's policies and procedures.

On March 7, 2008, Roberts met with Marinoff and Gist. At the outset of the meeting, Roberts gave Marinoff the business card of an individual at the NAACP. Roberts said it was not a racial issue, but she was concerned that Schwartz was "picking on" her. Stip. Facts ¶ 24. Marinoff shared seven written complaints regarding Roberts' shortcomings that Schwartz reported from February 20, 2008, to March 5, 2008. They included: tardiness, complaining, Roberts' reference to Schwartz as "the Devil" and another instance of Roberts yelling at Schwartz, along with inadequate or improper child care. *Id.* ¶ 26. On March 10, 2008, Marinoff met with Roberts again. He arranged for Roberts to speak with the FCPS Office of Equity and Compliance ("OEC") and reminded her to abide by FCPS policy with regard to requests for disability accommodation.

Roberts cites two specific occurrences of racial harassment.[1] On March 14, 2008, Roberts alleges Schwartz whispered: "I am going to kill you nigger" in her ear. *Id.* ¶ 34. She first reported this incident in a "rebuttal" memorandum to Principal Marinoff. *Id.* ¶ 30. Marinoff had documented his March 7 and 10 meetings with Roberts in a memorandum, which he sent to Roberts on March 14, 2008. Roberts sent Marinoff the rebuttal containing her accusation on March 20, 2008. Roberts maintains Richard Johnson was within two or three feet and observed the incident. Johnson denies the incident occurred. Eight days later, on March 22, 2008, Roberts submitted a written complaint regarding Schwartz to the OEC (the "OEC Complaint"). Roberts checked the boxes for discrimination based upon race, religion, and age. The body of the complaint detailed allegations of religious and age-based discrimination but contained no mention of any racial discrimination or use of the "N" word. There is also some inconsistency regarding the date this incident occurred. The stipulated facts, Roberts' handwritten notes, and the Roberts' rebuttal memorandum indicate this event occurred on March 14, 2008. However, Roberts' sworn charge before the Equal Employment Opportunity Commission (the "EEOC Charge") states no incidence of discrimination occurred before March 28, 2008.

Marinoff and Gist met with Roberts again on March 26, 2008. Marinoff expressed concern about Roberts' allegations that Schwartz used the "N" word. Roberts insisted she was not "making it up" and added an allegation that Schwartz had also threatened to kill her the

---

[1] In her deposition, for the first time, Roberts also claimed that Marinoff used the "N" word in a meeting with Roberts and Gist. *See* Roberts Dep. at 81-82 (Alleging Marinoff said: "Niggers around here do not act like you."). *But see* Marinoff Decl. ¶ 10 ("It is my understanding that Roberts is now claiming that I also used the "N" word in a conversation with her and Gist in March 2008. I vehemently deny that allegation. I have never used that racial slur in speaking to or about Roberts, or anyone else."). Defendant maintains such a claim is barred because it was not asserted and could not have logically arisen from the allegations in her EEOC complaint. Indeed, there were no allegations in the EEOC complaint against anyone besides Schwartz. *See Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (If "the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred."). The Plaintiff did not take issue with FCPS' contention that such an allegation is barred. The Court agrees. Allegations against Marinoff cannot arise out of an EEOC Charge dedicated to the wrongdoing of a single individual—Schwartz.

3

previous day. *Id.* ¶ 32. At the same meeting, Marinoff and Gist told Roberts that her work performance was still lacking. Without improvement, they warned, she could expect to receive a number of "Does Not Meet Expectations" in her year-end review, which could result in a decision not to reappoint her.

The second alleged use of a racial epithet occurred on March 28, 2008. Roberts maintains Schwartz said "that Nigger can't hear, she can't hear." Roberts Dep. at 62. Roberts alleges the statement was made in front of other instructional assistants, including Johnson and Laurie Burt. Both instructional assistants deny hearing Schwartz use the "N" word at any time.

Marinoff and Gist met with Roberts again on April 2 to discuss additional complaints about tardiness and lack of professionalism. On April 10, 2008, an ABA coach visited Schwartz's classroom. Gist also observed the visit. The ABA coach shared with Gist that Roberts required instruction with the "most basic ABA techniques." Def. Mot. Ex. G. Gist informed Roberts that she was not meeting the Job-Specific Knowledge and Skills and Instructional Support standards of performance for her position as an instructional assistant.

On April 16, 2008, Roberts reported to Marinoff that Schwartz believed in or practiced "witchcraft." Stip. Facts ¶ 39. On April 18, 2008, Roberts told another member of the Aldrin staff that Schwartz planned to "blow-up" her car. *Id.* ¶ 42. Gist and Marinoff heard of the allegation and proceeded to Schwartz's classroom, where Roberts was changing a student's diaper just inside the doorway, exposing the student's entire bottom publically. Roberts told Marinoff that the other instructional assistant, Johnson, heard Schwartz's threat but would "lie about it." *Id.* ¶ 43. Johnson denied hearing any such statement. Roberts was then placed in a different classroom and Marinoff referred her to the Employee Assistance Program.

4

In a May 2008 memo to Roberts, Marinoff wrote that he was "most concerned" that Roberts' continued allegations against Schwartz were growing more and more serious in nature. *Id.* ¶ 47. And while all had been taken seriously and investigated, "all remain unfounded." *Id.*

Roberts' final evaluation rated her as less than satisfactory in thirteen of twenty-one areas. Under FCPS regulations, a single unsatisfactory rating allows a principal to recommend an employee for termination. Marinoff recommended Roberts for termination on May 15, 2008. The same day, Roberts filed her EEOC Charge. The Charge alleged discrimination based upon: race, age, and disability; it also asserted retaliation. Roberts' separation from FCPS became effective June 17, 2008.

Roberts initially asserted five claims in this action: Count I - Title VII Racial Discrimination; Count II - Reprisal Discrimination & Violation of the Fourteenth Amendment; Count III - Racial Discrimination in Violation of 42 U.S.C. § 1981; Count IV – Violation of Age Discrimination in Employment Act of 1967; Count V – Intentional Infliction of Emotional Distress. Counts III and V were dismissed by consent order in March 2011. Counts II and IV were dismissed by a second consent order in January 2012. The sole remaining count is Count I—alleging racially hostile work environment in violation of Title VII.

I.  **Standard of Review**

Federal Rule of Civil Procedure 56 provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). A party moving for summary judgment has the initial burden of showing the court the basis for its motion and identifying the evidence that demonstrates the absence of a genuine issue of material fact. *Id.* Once the moving party satisfies its initial burden, the opposing party has the burden of showing, by means of affidavits or other verified evidence, that there exists a genuine dispute of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) ("[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a *genuine* issue of material fact for trial.") (emphasis original). A dispute of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party. . . ." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson*, 477 U.S. at 255). However, "[f]anciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Clinchfield Coal Co.*, 124 F.3d at 640.

II. Analysis

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A Title VII claim for a racially hostile work environment requires the Plaintiff to show the harassment was (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the terms of employment and create an abusive atmosphere; and (4) that it was imputable on some factual basis to her employer. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001). Roberts' allegations falter in two

6

respects. First, her allegations are insufficiently pervasive to alter the terms of her employment and create an abusive atmosphere. Second, her claims find such a paucity of support in the record that no reasonable jury could find in her favor.

### a. The Alleged Conduct Was Not Sufficiently Pervasive To Alter the Conditions of Roberts' Employment

The gravamen of Defendant's argument on summary judgment is that even if true, two isolated uses of a racial epithet are insufficient to meet the "severe and pervasive" prong of a hostile work environment claim. To meet Title VII's severe and pervasive prong, the Plaintiff's workplace must be "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (internal citations and quotations omitted); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct . . . [s]uch claims are based on the cumulative effect of individual acts."). "Relevant considerations 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Spriggs*, 242 F.3d at 184 (quoting *Harris*, 510 U.S. at 23). In the context of racial slurs, "there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997) (internal citations and quotations omitted).

"Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment that the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004) (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (citation and internal quotation marks omitted)). Where such an abhorrent slur is alleged, there is no question that its use was offensive, unwelcome, and racially motivated. *Shields v. Fed. Exp. Corp*, 120 F. App'x 956, 961 (4th Cir. 2005) (unpublished) (per curiam). Thus, the relevant question becomes whether the use of racial epithets "so pervaded the work environment . . . that it was essentially transformed into an atmosphere tinged with racial hostility and altered the conditions of [plaintiff's] employment." *Id*.

There is no bright line test for the "number of times a supervisor or employer can use a racial slur while addressing an employee without creating a hostile work environment for Title VII purposes." *Hampton v. J.W. Squire Co.*, No. 4:10cv13, 2010 WL 3927740, at *3 (W.D. Va. Oct. 5, 2010). Instead, Courts attempt to distinguish colorable allegations of pervasive and general use with isolated instances that, although reprehensible, do not rise to level of severity necessary alter the conditions of an employee's work environment. *Compare Spriggs*, 242 F.3d at 182 (finding "incessant" racial slurs from a supervisor who "rarely hesitated to vilify anyone of African descent, including [Defendant's] employees (whom he proclaimed 'niggers' or 'monkeys')" sufficiently severe and pervasive), *and White*, 375 F.3d at 297 (finding conduct sufficiently severe and pervasive where "throughout" the Plaintiff's employment, supervisors "repeatedly called him and other black employees 'boy, jigaboo, nigger, porch monkey, Mighty Joe Young,' and 'Zulu warrior.'"), *with Skipper v. Giant Food Inc.*, 68 F. App'x 393, 398 (4th Cir. 2003) (manager who harassed plaintiff by following him around and referring to him by a

racial slur on one occasion, coupled with daily exposure to racist graffiti and the Plaintiff overhearing other employees use the same slur thirteen times in a four year period insufficient), *and Hampton*, 2010 WL 3927740, at *3 (finding supervisor who referred to the plaintiff using the term "nigger" on three occasions insufficient).[2] In the context of this dichotomy, allegations that Schwartz used a racial slur on two occasions are insufficient.

In contrast to the pervasive comments in *Spriggs* or *White*, Roberts alleges only two instances of Schwartz using a racial epithet. Though both comments were deplorable, their isolation is uncontroverted. Such limited use of a racial slur is insufficient to permeate Roberts' work environment "with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citations and quotations omitted). Therefore, even assuming their veracity, Plaintiff's allegations are legally insufficient to state a claim under Title VII.

### b. No Fair-Minded Jury Could Return a Verdict for the Plaintiff

Roberts' claim fails for an additional reason. Her allegations suffer from an array of maladies such that no reasonable jury could find in her favor. Namely, her allegations coincide remarkably with her poor job reviews, are rife with inconsistency, and lack corroboration. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing, by means of affidavits or other verified evidence, that there exists a genuine dispute of material fact. *See Matsushita*, 475 U.S. at 586-87. Despite Roberts' deposition

---

[2] *See also Hammon v. Taneytown Volunteer Fire Co.*, 2009 WL 3347327, at *3 (D. Md. Oct. 13, 2009) (supervisor who "frequently" used the word "nigger" and co-workers that "frequently" made racist remarks, including "repeatedly" using the word "nigger" in Plaintiff's presence and referring to the plaintiff "exclusively" as a "dumb ass nigger" for over a month sufficiently severe and pervasive); *Barrow v. Georgia Pac. Corp.*, 144 F. App'x 54, 57 (11th Cir. 2005) (allegations that Plaintiff saw displays of rebel flag, the letters "KKK" on a bathroom wall, a noose in another employee's locker, a superintendent called him "nigger" three times in one year and told him he would kick his "black ass" and his supervisor called him a "nigger" and told him that if he looked at "that white girl" he would "cut" him was insufficiently severe and pervasive).

9

testimony that there were witnesses to Schwartz's conduct, the Plaintiff has not put forth a single verified statement from any witness who supports Roberts' recollection. Indeed, *every* declaration currently before the Court supports FCPS. In short, Roberts' allegations are the type of fanciful allegations that no reasonable juror could believe. *See id.* at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (internal quotation omitted); *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *see also Clinchfield Coal Co.*, 124 F.3d at 640 ("Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment."); *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (to avoid summary judgment, the nonmoving party "must offer some hard evidence that its version of the events in question is not wholly fanciful.").[3]

Roberts' allegations coincided with and were sometimes expressly in response to meetings to discuss her poor performance. Beginning in early 2008, as Assistant Principal Gist and Principal Marinoff confronted Roberts regarding her workplace shortcomings, she responded with allegations against Schwartz. Roberts' conduct failed to improve and in the face of frequent performance reviews with her superiors, her allegations became more serious.

For instance, Roberts first publically alleged Schwartz whispered "I am going to kill you nigger" in a written rebuttal to a memorandum drafted by Principal Marinoff to document Roberts' tardiness and unprofessional conduct. When Marinoff and Gist met with Roberts, she

---

[3] Undoubtedly, credibility determinations are within the province of the jury and it is not the role of the Court "to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose [her], or to disregard stories that are hard to believe." *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991). Nonetheless, it remains the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

insisted she was "not making it up" and added the allegation that Schwartz had threatened to kill her the previous day. Stip. Facts ¶ 32.

The second alleged use of a racial epithet was also preceded by a meeting with Gist and Marinoff to discuss Roberts' work performance. On March 26, 2008, Marinoff advised Roberts that without immediate improvement, she would be at risk of not being rehired for the next school year. Two days later, Roberts alleged Schwartz said "that Nigger can't hear." Although Roberts did not allege further use of racial epithets, her allegations against Schwartz and their correlation with meetings regarding her performance continued.

On April 10, 2008, Gist and an ABA coach observed Schwartz's classroom. Gist documented her observations and sent them to Roberts on April 16, 2008. Gist wrote that Roberts did not meet several standards of performance and noted the ABA coach's view that Roberts had "difficulty" with the "most basic ABA techniques." Def. Mot. Ex. G. Roberts met with Marinoff on the same day she received Gist's summary of her April 10 observation. Roberts informed Marinoff that Schwartz might be practicing "witchcraft" in the classroom. *Id.* ¶ 39. The next day, Roberts told a member of the Aldrin staff that Schwartz planned to "blow up" her car. *Id.* ¶ 42. After Marinoff and Gist's investigation failed to uncover any support for Roberts' allegations, Marinoff expressed his concerns to Roberts in a May 2008 memorandum. Marinoff indicated his concern that Roberts' allegations against Schwartz "continue to be more and more serious in nature" and that while all have been seriously considered and investigated, "all remain unfounded." *Id.* ¶ 47.

In addition to questionable timing, Roberts' allegations are plagued by inconsistency and a lack of any corroboration. Plaintiff's most severe allegation—that Schwartz stated "I am going to kill you nigger"—is the most tarnished. Roberts maintains that Schwartz's first slur occurred

11

on March 14, 2008. However, Roberts' sworn EEOC Charge lists March 28, 2008 as the earliest date any discrimination took place. It makes no reference to any threat, let alone one as serious as "I am going to kill you nigger." Instead, it mentions only one incident, on March 28, 2008, when Schwartz alleged called Roberts a "Nigger." Def. Mot. Ex. M.

Allegations regarding the March 14 incident are similarly absent from Roberts' OEC Complaint, which she filed just eight days after the threat allegedly occurred. Roberts checked the box for racial, religious, and age discrimination, but made no mention of any racial discrimination in the body of the Complaint. In contrast, Roberts provided detailed descriptions of instances where Schwartz discriminated against her on the basis of her religion and age. Roberts' OEC Complaint is also notable in an additional respect. It lists Richard Johnson—her African-American co-worker—as a similarly situated employee who did the same things Roberts was cited for but received different, presumably favorable, treatment. *See also* Roberts Dep. at 55 (stating Schwartz gave Mr. Johnson more sophisticated tasks); Def. Mot. Ex. E at 4 (stating Schwartz "would relay information to Richard but not to me.").

The March 14 threat also lacks any corroboration. Roberts alleges Schwartz made the comment in front of Richard Johnson. Roberts Dep. at 72, 76. Johnson unequivocally denies the incident occurred. Johnson Decl. ¶ 8 ("I understand that Roberts has alleged I witnessed Schwartz use the "N" word. That allegation is absolutely untrue."). In fact, Johnson goes further and notes he never heard Schwartz comment on his or Roberts' African-American race, use the "N" word, or use inappropriate language of any kind. *Id.* ¶¶ 7-8.

The second incident also lacks corroboration. Roberts alleges Schwartz stated "that Nigger can't hear, she can't hear" at a gathering on March 28, 2008. Roberts alleges that "quite a few" people heard the slur, including Richard Johnson and Laurie Burt. Roberts Dep. at 62-63.

As has been previously noted, Richard Johnson emphatically denies hearing Schwartz use a racial slur at any time. Burt likewise denies Roberts' allegations. *See* Burt Decl. ¶ 10 (stating that any allegation that she witnessed Schwartz use the "N" word "is absolutely not true. I never heard Roberts use any inappropriate language, much less a racial epithet, toward anyone. Nor did I ever hear Schwartz disparage Roberts in any way.").[4]

The Plaintiff does not rebut Johnson and Burt's statements with sworn testimony or a declaration from any witness. Once again, individuals—whom Roberts identified as witnesses to Schwartz's use of racial slurs—fail to corroborate Roberts' allegations. Worse, they categorically refute her version of the events in question. Such a lack of corroborative support is unlikely to persuade any reasonable jury to adopt Roberts' version of either incident.

In sum, this is not the typical he-said-she-said factual dispute, where it becomes the province of the jury to sift through competing accounts and render judgment in accord with their credibility determinations. There is a mountain of sworn testimony flatly contradicting the Plaintiff's allegations. In response, Roberts does not point to a single witness declaration or any witness' deposition testimony that supports her case. She stands contradicted by her OEC Complaint, her sworn EEOC Charge, and multiple sworn statements from witnesses she herself identified. The witnesses deny not only the two instances in question, but also any use of a racial epithet by Schwartz. Such a dearth of evidence could not lead any reasonable trier of fact to find in favor of the Plaintiff.

---

[4] The remaining relevant declaration before the Court also denies Schwartz used the "N" word or used a racial slur at any time. *See* Alston-Harrison Decl. ¶¶ 6-7 (stating that any allegation that I witnessed Schwartz call Roberts the "N" word is "absolutely not true. I never heard Schwartz use the "N" word toward or about Roberts, or about anyone else. . . . I also never heard Schwartz express racial animus towards Roberts or any other African-Americans, including myself.").

### III. Conclusion

For the foregoing reasons, the Court GRANTS FCPS's Motion for Summary Judgment on the sole remaining Count of race-based harassment under Title VII.

An appropriate order will issue.

February 6, 2012
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge